1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

LENIER AYERS,

11                                    Plaintiff,

12        v.

13  HENRI RICHARDS, LESLIE
SZIEBERT, WALT WIENBERG,
14  WILLIS STODDARD, THOMAS
BELL, RUSSELL BOATMAN, JOHN
15  LEWIS, CHAD LEWING, PAUL
TEMPOWSKY, BECKY DENNY,
16  KRISTAL KNUTSON, BEVERLY
KNODOL, AND BOBBIE
17  CERVANTEZ,

18                                   Defendants.

19

No. C08-5390 BHS/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  August 20, 2010**

20        Before the court is the motion for summary judgment of Defendants Thomas Bell,

21  Russell Boatman, Bobbie Cervantes, Becky Denny, Henry Richards, Ph.D, Willie Stoddard,

22  Leslie Sziebert, M.D., Paul Temposky, and Walter Weinberg ("Defendants" or collectively

23  "SCC")[1].  Dkt. 175.  Plaintiff Lenier Ayers filed a "Declaration in Opposition/Response" (Dkt.

24

25

26

---

[1] Kristal Knutson, John Lewis and Chad Lewing have not been served in this case.  *See* Dkts. 33, 34 and 35.

REPORT AND RECOMMENDATION - 1

199) and Defendants filed a reply.  Dkt. 200.[2]  Defendants argue that Mr. Ayers' claims should be dismissed because he cannot demonstrate that the SCC Defendants failed to exercise professional judgment, that he has received appropriate medical care, that his claims relating to his commitment as a sexually violent predator violate the favorable termination doctrine, and that various claims are time-barred or are insufficient under a theory of *respondeat superior*.  Dkt. 175, p. 2.

Having carefully reviewed the parties' pleadings, supporting declarations, and balance of the record, and viewing the evidence in the light most favorable to Mr. Ayers, the undersigned recommends that the Defendants' motion for summary judgment be granted.

### SUMMARY OF CASE

In his complaint, Mr. Ayers sets forth multiple claims against multiple parties, including that (1) he was imprisoned in a cellblock under hazardous conditions, (2) SCC staff used excessive force against him; (3) he has been subjected to malicious prosecution to ensure his continued confinement at SCC; (4) he has been denied access to courts; (5) he has been denied dental care; (6) he has been denied medical care for a broken thumb, Hepatitis C treatment, and for injuries sustained in attacks by SCC staff and other residents; (7) SCC staff subjected him to excessive noise, denied his medical meals and failed to protect him from assaults; and (8) SCC staff violated the Washington State Public Disclosure Act (Wash. Rev. Code 45.56) and Washington State's Abuse of Vulnerable Adults Act (Wash. Rev. Code 74.34).  Defendants move for summary judgment on all of Mr. Ayers' claims.  In addition, they move for dismissal of any claims against the individual defendants in their official capacities.  The relevant facts, the

---

[2] The motion for summary judgment was renoted after Judge Settle referred this case to the undersigned for consideration of Plaintiff's claims on the merits.  Dkt. 201.

REPORT AND RECOMMENDATION - 2

court's legal analysis and conclusion are set forth under each heading dealing separately with the claims at issue.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those positions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case.  *Celotex*, 477 U.S. at 325.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d 202 (1986).

"To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001).  Rule 56(e) "requires that affidavits submitted in support of a motion for summary judgment must: (1) be made on the personal knowledge of an affiant who is competent to testify to the matter stated therein, (2) must state facts that would be admissible in evidence, and (3) if

REPORT AND RECOMMENDATION - 3

1  the affidavit refers to any document or item, a sworn or certified copy of that document or item

2  must be attached to the affidavit." *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1023  (N.D.

3  Cal. 2006) (citations omitted).

4      Thus, "[a] declarant must show personal knowledge and competency to testify [as to] the

5  facts stated." *Id*. (citing *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir.1995)).  In

6  other words, "[t]he matters must be known to the declarant personally, as distinguished from

7  matters of opinion or hearsay"; "[a] declarant's mere assertions that he or she possesses personal

8  knowledge and competency to testify are not sufficient." *Id*. (citing *Barthelemy v. Air Lines

9  Pilots Ass'n*, 897 F.2d 999 (9th Cir.1990)).  "Rather, in accordance with Rule 56(e), a declarant

10 must show personal knowledge and competency "'affirmatively,' ... for example, by the nature

11 of the declarant's position and nature of participation in [the] matter.'" *Harris Technical Sales,

12 Inc. v. Eagle Test Systems, Inc*., 2008 WL 343260, at *2 (D. Ariz. 2008) (quoting *Boyd*, 458 F.

13 Supp.2d at 1023).

14     In this regard, the court notes that Mr. Ayers responded to Defendants' motion for

15 summary judgment by filing his sworn statement.  Dkt. 199.  In the statement, Mr. Ayers

16 declares that the facts and conclusions stated in his complaint are true.  *Id.*, p. 3, ¶ 13; p. 8, ¶ 66.

17 In addition, Mr. Ayers invites the court to consider the "four hundred and one pages of

18 documents" he filed in C08-5541 RJB/KLS.  *Id.,* ¶ 2.[3]  Mr. Ayers does not explain, however,

19 why these documents are relevant and he does not cite to any particular page of the documents in

20 an effort to refute the evidence or argument of Defendants.  As noted by Defendants, the court

21 need not search for evidence or manufacture arguments for a plaintiff.  Dkt. 200, p. 2 n.1 (citing

22

23

24

25

26 [3] Mr. Ayers also asks that the court consolidate this case with Case No. C08-5541 so that the same evidence can be used in both cases.  Mr. Ayers' motion to consolidate was denied under separate order on May 26, 2010.  Dkt. 204.

REPORT AND RECOMMENDATION - 4

1    *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th

2    Cir. 1997) ("[w]e will not manufacture arguments for an appellant, and a bare assertion does not

3    preserve a claim . . . . 'Judges are not like pigs, hunting for truffles buried in briefs.'"), *quoting*

4    *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

## DISCUSSION

**A.    Confinement in "Condemned 1930's/1940's Era Cellblock**

Mr. Ayers alleges that he was unnecessarily housed in a "badly delapodated [sic], 1940's

prison cellblock, under extremely unsafe, and hazardous living conditions, from 6/1/04 to

12/1/04." Dkt. 16, p. 27 (Claim #1).  Mr. Ayers also alleges that this confinement occurred

"[f]rom 6/1/04 to 12/1/04 and to May 2005." *Id.*, p. 28.  In the "Statements of Claim" portion of

his complaint, Mr. Ayers alleges that Dr. Sziebert "is responsible for denying medical meal

access, forcing Plaintiff to punitively isolate in delapodated aspestose [sic] filled cellblock, and

enabling staff abuse against the Plaintiff, from 2003 to 2008." Dkt. 16, p. 2.

Mr. Ayers alleges that he was subjected to "cruel and unusual punishment under

unhealthful, and extremely emotionally distressful conditions of confinement from 6/1/04 to

5/2005." Dkt. 16, p. 44 (Claim # 3).  In this claim, Mr. Ayers again alleges that Dr. Sziebert is

responsible for "punitively" isolating him in a "badly delapodated [sic] 1940's McNeil Island

Prison cellblock infrequently for continuous period, from 5/2004 to 1/2005 and continuously for

a five month period from Dec. 2005 to May 2005 [sic]." *Id.*

According to Becky Denny, the Legal Coordinator at the SCC, Mr. Ayers was transferred

from the former SCC facility located within the perimeter of the McNeil Island Corrections

Center to the newly constructed, stand-alone SCC facility on May 3, 2004, where he has since

REPORT AND RECOMMENDATION - 5

resided.  Dkt. 177, p. 2, ¶ 7.  Mr. Ayers provides no evidence to the contrary.  It is also undisputed that Mr. Ayers filed his complaint in this action on June 18, 2008.  Dkt. 1.

The Washington state statute of limitations governing personal injury actions applies to claims brought under 42 U.S.C. § 1983.  *See Wilson v. Garcia*, 471 U.S. 261, 276-79, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).  The Ninth Circuit held that the applicable Washington statute is Wash. Rev. Code ("RCW") § 4.16.080.  *Rose v. Rinaldi*, 654 F.2d 546, 547 (9th Cir. 1981); *see also Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991), *cert. denied*, 502 U.S. 1091, 112 S. Ct. 1161, 117 L.Ed.2d 409 (1992).  RCW § 4.16.080 provides a three-year statute of limitations. Thus, to have been timely, Mr. Ayers' § 1983 claims relating to the conditions of his confinement in the former SCC facility would have had to have been brought sometime in May of 2007.

Accordingly, the undersigned recommends that Mr. Ayers' claims relating to the conditions of his confinement prior to May 2007 be dismissed with prejudice because they are time barred.

**B.    Excessive Force by SCC Staff on April 7, 2005**

Mr. Ayers claims that he was assaulted by SCC staff, including Defendants Boatman and Lewis, on April 7, 2005.  Dkt. 16, p. 5, Dkt. 16-3, p. 1 (Claim # 12).   He alleges that he was not allowed to file a police report regarding the incident, and that Dr. Sziebert and Chad Lewing were responsible for the attack because they created the "stipulated conditions" that "resultingly [sic] orchestrated the 4/7/05 attack."  Dkt. 16, pp. 2, 4.

The alleged "4/7/05 attack" occurred more than three years before Mr. Ayers filed his complaint on June 18, 2008.  Based on Washington's three year statute of limitation, as

REPORT AND RECOMMENDATION - 6

discussed above, Mr. Ayers' claims regarding excessive force in April of 2005 are time-barred and should be dismissed with prejudice.

**C.      Malicious Prosecution – Continued SCC Commitment**

In an unnumbered claim, Mr. Ayers asserts that he is being "maliciously subjected to the intentional infliction of emotional distress, with a conspiratorial objective in acquiring forensic evidence in order to confirm [his] indefinite detention as well as continued prosecution." Dkt. 16, p. 16. In summary, Mr. Ayers alleges on-going situations where SCC staff members harass him, he files a grievance relating to the harassment, the grievance goes unresolved, the unchecked staff abuse results in the development of negative behavioral records that "prove his inclination," and these behavioral records are then "strategically filtered into the Office of the Attorney General for use against the Plaintiff in order to maliciously justify the Attorney General's aspired want to continue [Mr. Ayers'] prosecution." *Id.* Mr. Ayers states that this process is being used as a means of developing false documents to illustrate that he suffers from a mental disorder and is sexually dangerous. *Id.*

Mr. Ayers also alleges that SCC staff, including Defendant Stoddard, have generated "false behavioral reports," which were used against him in his civil commitment trial. Dkt. 16, pp. 17-20; p. 2. He alleges that Dr. Sziebert denied him "medical meals" as part of a "conspiracy" or "overlitigation strategy" to cause Mr. Ayers to become "verbally aggressive," so that Dr. Sziebert could then document and use this verbal aggression against Mr. Ayers in his civil commitment trial. *Id.*, pp. 17-20.

Mr. Ayers describes this claim as a "process of intentionally inflicting emotional distress upon [him] as a means of acquiring a maliciously documentable reaction" and as a "means of

REPORT AND RECOMMENDATION - 7

generating and maliciously developing negative forensic documentation in order to insure [his] ongoing detention during trial," and indeed, his "indefinite detention."  Dkt. 16, p. 19, ¶¶ 18-20.

If Mr. Ayers is challenging his commitment or continued commitment to SCC, his federal remedy is a petition for writ of habeas corpus pursuant to 28 U.S.C. Section 2254, after he exhausts state judicial remedies.  *See Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S. Ct. 1827, 36 L.Ed.2d 439 (1973).  A civil rights action under Section 1983 is the proper vehicle to challenge conditions of confinement; a habeas corpus petition is the sole federal vehicle for challenging the fact or duration of confinement.  *Id*. at 498-99.  The Ninth Circuit Court of Appeals has held:

> *Heck's* favorable termination rule was intended to prevent a person in custody from using § 1983 to circumvent the more stringent requirements of habeas corpus....  It is well established that detainees under an involuntary civil commitment scheme such as SVPA may use a § 2254 habeas petition to challenge a term of confinement.  See *Duncan v. Walker*, 553 U.S. 167, 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (stating that a state court order of civil commitment satisfies a § 2254 "in custody" requirement).

*Huftile v. Miccio-Fonseca*, 410 F.3d 1136, 1139-40 (9th Cir. 2005)  (*Heck* applies to SVP detainees with access to habeas relief).  *Id*. at 1140.

Mr. Ayers is presently a civil detainee at the SCC.  Thus, in order to challenge his involuntary civil commitment, he must pursue habeas relief under 28 U.S.C. Section 2254.  To the extent Mr. Ayers seeks damages for his commitment, his claims are also barred.  *See, e.g., Huftile*, 410 F.3d at 1140 (*Heck* requires a civilly committed person to invalidate his civil commitment before pursuing a Section 1983 damages claim implying that his commitment is invalid).

Although Mr. Ayers does not directly address the substantive merits of his underlying civil commitment, he does challenge the manner in which information is used to evaluate him for

REPORT AND RECOMMENDATION - 8

further commitment.  A judgment in his favor that his civil commitment is being prolonged by

the use of false information would "necessarily imply the invalidity" of his continued

commitment.  As was explained by the Ninth Circuit in *Huftile*:

> The Supreme Court has instructed, however, that *Heck* envisioned "the possibility ... that the nature of the challenge to the procedures could be such as necessarily to imply the invalidity of the judgment." *Edwards v. Balisok*, 520 U.S. 641, 645, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).  In *Balisok*, the alleged procedural violations involved a hearing officer's decision, motivated by "deceit and bias," to exclude exculpatory evidence in a disciplinary proceeding. *Id*. at 646-47, 117 S. Ct. 1584. The *Balisok* Court reasoned that a "criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Id*. at 647, 117 S. Ct. 1584.  It therefore concluded that Balisok's § 1983 claim for declaratory relief and money damages necessarily implied the invalidity of the disciplinary action and rendered his claim not cognizable under *Heck*. *Id*. at 648, 117 S. Ct. 1584.

> Huftile's § 1983 claim is factually similar to that in *Butterfield v. Bail*, 120 F.3d 1023 (9th Cir. 1997).  In *Butterfield*, the prisoner-plaintiff brought a § 1983 suit on the ground that the parole board allegedly relied on false information in his prison file to deny him parole. *Id*. at 1024.  We held that *Heck* applied:

>> Butterfield alleges that defendants violated his due process rights by considering false information in his prison file to find him ineligible for parole.  We have no difficulty in concluding that a challenge to the procedures used in the denial of parole necessarily implicates the validity of the denial of parole and, therefore, the prisoner's continuing confinement.

*Huftile,* 410 F.3d at 1140.

Likewise, Mr. Ayers' claims attacking the procedures used by SCC in continuing his civil

detention must be dismissed as this is not the proper venue for bringing such claims.

Accordingly, the undersigned recommends that these claims be dismissed without prejudice.

REPORT AND RECOMMENDATION - 9

**D.      Access to Courts**

Mr. Ayers alleges that he was denied access to the courts when the mailroom sabotaged court documents, when SCC refused to allow him to purchase a legal computer or typewriter, and he was denied phone access to contact the courts and his attorney.  Dkt. 16, pp. 4-5 (Claim # 6, 7, 9, 13, and 14).

The Fourteenth Amendment guarantees persons in state custody meaningful access to the courts, a right which is an aspect of the First Amendment right to petition the government for a redress of grievances.  *Bill Johnson's Restaurants, Inc. v. National Labor Relations Board*, 461 U.S. 731, 741, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983); *Bounds v. Smith*, 430 U.S. 817, 828, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977).  This right of access requires state officials to assist persons in state custody in preparing and filing legal papers by either:  (1) providing them with persons trained in the law or (2) providing adequate law libraries.  *Bounds*, 430 U.S. at 828.  However, "law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  *Lewis v. Casey,* 518 U.S. 343, 351 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (quoting *Bounds*, 430 U.S. at 825).  The purpose of the right to meaningful access is to provide those in state custody the tools necessary "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."  *Lewis*, 518 U.S. at 355.

To establish a violation of the right of access to courts, a plaintiff must allege both that he was denied access to legal research materials or advice and that this denial harmed his ability to pursue non-frivolous legal action, i.e., plaintiff must show actual injury.  A plaintiff cannot show an actual injury "simply by establishing that [the state's] law library or legal assistance program

REPORT AND RECOMMENDATION - 10

is subpar in some theoretical sense." *Lewis*, 518 U.S. at 351.  Instead, actual injury results from "some specific 'instance in which [the plaintiff] was actually denied access to the courts.'" *Sands v. Lewis*, 886 F.2d 1166, 1170-71 (9th Cir. 1989).

**1.    Access to Computer or Typewriter**

Mr. Ayers alleges that he was denied access to the courts because he was not permitted to purchase a typewriter or computer.  Dkt. 16, p. 4; Dkt. 16-2, p. 19.  His request to purchase a computer was denied based on his restricted level.  Dkt. 16-2, pp. 21-22.

According to Ms. Denny, SCC's Legal Coordinator, all SCC living units have on-unit legal computers, complete with legal resources including Westlaw's Premise application.  Dkt. 177, p. 2, ¶ 8.  Databases include the U.S. Supreme Court, Ninth Circuit Court of Appeals, Washington Court of Appeals and Supreme Court cases, the Washington Administrative Code, and the Revised Code of Washington. The SCC also keeps copies of the Prison Litigator's Handbook in the SCC library.  The SCC subscribes to advance sheets which are maintained in binders in the SCC Library for the federal Circuit Courts of Appeal, the U.S. Supreme Court and the Federal Appendix. The legal network is available for resident use daily from at least 6:00 a.m. to 10:00 p.m., except during resident count.  *Id.*

There is no constitutional requirement that Mr. Ayers be allowed to possess every tool that might be convenient to litigate effectively once he is in court.  *Lewis*, 518 U.S. at 354.  In addition, as noted above, the Ninth Circuit has determined that "right of access" claims that do not allege inadequacy of the law library or inadequate assistance from persons trained in the law, must allege an "actual injury" to court access.  *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989).  An "actual injury" consists of some specific instance in which an inmate was actually denied access to the courts.  *Id*.  Only if an actual injury is alleged may a plaintiff's claim

REPORT AND RECOMMENDATION - 11

1    survive. *Id.*   Mr. Ayers alleges that he has been "forced to miss court motion filing deadlines as

2    the result of this denied access," but there is no evidence that Mr. Ayers has missed any filing

3    deadlines in this case or any other case.  In addition, a refusal to allow Mr. Ayers to purchase a

4    "legal" computer or typewriter where one is available on every living unit for use every day and

5    no court imposed deadlines are at issue simply fails to state a claim.

6         Defendants also correctly note that Mr. Ayers has had ample access to this court.  The

7    court's docket reflects that nothing has prohibited Mr. Ayers from filing numerous pleadings,

8    motions and documents in this case.  Mr. Ayers raises several legal theories and includes state

9    and federal citations to support his numerous causes of action.  The undisputed record reflects

10   that Mr. Ayers has had ample access to challenge the conditions of his confinement in this case.

11   In addition, since January 2005, three years before he filed this lawsuit, Mr. Ayers pursued

12   numerous lawsuits in state and federal court, filing over 100 pleadings.  Dkt. 178, Attach. A.

13        **2.     Mailroom Sabotage of Documents/Access to Telephone**

14        Mr. Ayers also alleges that SCC mailroom staff sabotaged his court documents and that

15   he was denied legal phone access.  Dkt. 16, pp. 4-5.  Mr. Ayers alleges that "upon several

16   separate occasions" his mail has gone missing.  *Id.*, p. 14.  In particular, he alleges that he mailed

17   documents to the court on April 7, 2008 and on April 16, 2008, he was told that the court had not

18   received the documents.  *Id.*  There is, however, no evidence that Mr. Ayers suffered an actual

19   injury or was denied access to the courts.  And, as noted above, the docket in this case reflects

20   that Mr. Ayers has had ample access to challenge the conditions of his confinement.

21        Mr. Ayers also alleges that he is limited to one twenty minute "legal" phone call per day

22   and that this access is not sufficient.  The Ninth Circuit has "recognized detainees' and prisoners'

23   first amendment right to telephone access .... subject to rational limitations in the face of

24

25

26

REPORT AND RECOMMENDATION - 12

legitimate security interests of the penal institution." *Strandberg v. City of Helena*, 791 F.2d

744, 747 (9th Cir.1986) (quotation marks and citation omitted); see also *Barnett v. Centoni*, 31

F.3d 813, 816 (9th Cir.1994) (indicating that a prisoner may be deprived of access to the courts

because he was denied telephone access to his attorney).

In this case, however, Mr. Ayers admits that he is provided telephone access every day

for twenty minutes.  There is no evidence that Mr. Ayers has suffered an actual injury or was

denied access to the courts because of insufficient access to a telephone.

### 3.      Loss of Headphones

Mr. Ayers includes within his access to courts claim, an allegation that an expensive

watch (subsequently delivered to him) and a pair of *Bose* QC-3 headphones valued at $350.00

were stolen from him.  Dkt. 16-2, p. 14; Dkt. 16-3, p. 19.

In his deposition, Mr. Ayers asserted that Defendant Bobbie Cervantes[4] was "directly

responsible for the seeming deliberate loss or theft of mail," including his headphones.  Dkt. 178-

4, pp. 2-3 (CM-ECF pagination )[5].  Mr. Ayers testified that he came to the conclusion that Ms.

Cervantes received the headphones but sent them out of the facility because she believed that Mr.

Ayers had not been authorized to receive them.  Mr. Ayers bases his conclusion, at least in part,

on a statement made to him by Kent Ruby (a non-party), who allegedly told Mr. Ayers that Ms.

Cervantes mailed the headphones to Western State Hospital.  *Id.*, pp. 4-5.  Mr. Ayers also states

that he received replacement headphones valued at $369.00 after an investigation at *Bose*

---

[4] The parties refer to this defendant's last name interchangeably as Cervantez and Cervantes.  The court shall refer to Ms. Cervantes based on her signature on her Acknowledgement of Receipt of Summons and Complaint.  Dkt. 45, p. 2.

[5] For ease of reference, the court refers to CM/ECF page numbers and not the page numbers of the attached deposition transcripts.

REPORT AND RECOMMENDATION - 13

revealed that someone on the dock was stealing and "after a year and almost a year and a half, they sent me another pair." *Id.*, pp. 5-6.

In his complaint, Mr. Ayers alleges that he "suffered the theft" of some *Bose* headphones (Dkt. 16-2, p. 14), but he has not asserted any claims against Ms. Cervantes.  His assertion that Ms. Cervantes shipped the headphones to Western State based on her mistaken belief that Mr. Ayers was not authorized to receive them, is based solely on hearsay.  In addition, a temporary loss of personal property without competent evidence to attribute the loss to Ms. Cervantes, or any other defendant, fails to raise a claim of constitutional magnitude. *See Parratt*, 451 U.S. at 545 (Stewart, J., concurring) (in § 1983 lawsuit claiming that prison mailroom lost inmate's hobby kit: "[t]o hold that this kind of loss is a deprivation of property within the meaning of the Fourteenth Amendment seems not only to trivialize, but grossly to distort the meaning and intent of the Constitution.")

Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Ayers' claims that he was denied access to courts and for loss of property be dismissed with prejudice.

**E.      Claim of Broken Tooth – Defendant Paul Tempowsky**

Mr. Ayers alleges that on or about September 2, 2005, he bit into an "SCC breakfast muffin" served to him by an unnamed kitchen staff member, and broke his eye tooth.  Dkt. 16-2, p. 5 (Claim # 5).  Mr. Ayers alleges that Defendant Paul Tempowsky, SCC's Food Services Manager, was negligent in the improper preparation of the muffin. *Id.*  In his deposition, Mr. Ayers explained that he is suing Mr. Tempowsky for his "[i]naction and failure to appropriate supervise his staff."  Dkt. 178-4, p. 9.

REPORT AND RECOMMENDATION - 14

To sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the alleged deprivation. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) (holding that there is no respondeat superior liability under § 1983). A supervisor is only liable for the constitutional violations of subordinates if the supervisor participated in or directed the violations. *See id*. Knowledge and acquiescence in a subordinate's unconstitutional conduct is insufficient; government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others. *See Ashcroft v. Iqbal*, ---U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. See *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir.1978). Vague and conclusory allegations concerning the involvement of supervisory personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir.1982). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Iqbal*, 129 S.Ct. at 1948.

REPORT AND RECOMMENDATION - 15

Defendant Temposky cannot be liable for the actions or inactions of the kitchen staff.  He can only be liable for his own actions or lack of action.  Mr. Ayers did not allege nor has he provided evidence showing that Mr. Temposky knew that his staff was serving "rock-hard muffins," the damage this conduct allegedly caused and that, despite such knowledge failed to remedy the situation.

In addition, as correctly noted by Defendants, the conduct complained of constitutes negligence only and negligent acts by state officials that cause an "unintended loss of injury to life, liberty, or property" do not give rise to a constitutional claim.  *Daniels v. Richards*, 474 U.S. 327, 328, 106 S. Ct. 662, 88 L. Ed.2d 662 (1986).

Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Ayers' claim against Defendant Tempowsky for dental injuries be dismissed with prejudice.[6]

## F.    Failure to Provide Medical Treatment

Mr. Ayers alleges that Defendant Thomas Bell, D.O., has refused to provide "badly required medical care" for (1) his broken thumb; (2) his Hepatitis C; (3) for pain management; and (4) for injuries sustained in attacks by SCC staff and other residents.  Dkt. 16, p. 2; Dkt. 178-3 , pp. 3-8 (Claim # 4).

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 7, 104 (1976).  Deliberate indifference includes denial, delay or intentional interference with a

---

[6] Also included in Mr. Ayers' complaint is a claim against Beverly Knodol regarding the lack of dental care following the September 2, 2005 muffin incident.  Although named as a defendant, Beverly Knodol has not been served with Plaintiff's Complaint and therefore, personal jurisdiction over her does not currently exist and the Court has no authority over her.

REPORT AND RECOMMENDATION - 16

prisoners's medical treatment.  *Id.* at 104-5; see also *Broughton v. Cutter Labs.*, 622 F.2d 458, 459-60 (9th Cir. 1980).  To succeed on a deliberate indifference claim, an inmate must demonstrate that the prison official had a sufficiently culpable state of mind.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  A determination of deliberate indifference involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).

First, the alleged deprivation must be, objectively, "sufficiently serious."  *Farmer*, 511 U.S. at 834.  A "serious medical need" exists if the failure to treat a prisoner's condition would result in further significant injury or the unnecessary and wanton infliction of pain contrary to contemporary standards of decency.  *Helling v. McKinney*, 509 U.S. 25, 32-35 (1993); *McGuckin*, 974 F.2d at 1059.  Second, the prison official must be deliberately indifferent to the risk of harm to the inmate.  *Farmer*, 511 U.S. at 834.

An official is deliberately indifferent to a serious medical need if the official "knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 837.  Deliberate indifference requires more culpability than ordinary lack of due care for a prisoner's health.  *Id.* at 835.  In assessing whether the official acted with deliberate indifference, a court's inquiry must focus on what the prison official actually perceived, not what the official should have known.  See *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).   In other words an official must (1) be actually aware of facts from which an inference could be drawn that a substantial risk of harm exists, (2) actually draw the inference, but (3) nevertheless disregard the risk to the inmate's health.  *Farmer*, 511 U.S. at 837-8.

Prison authorities have "wide discretion" in the medical treatment afforded prisoners.  *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir. 1971), cert. denied, 387 U.S. 922 (1972).  To prevail

REPORT AND RECOMMENDATION - 17

on an Eighth Amendment medical claim, the plaintiff must "show that the course of treatment the doctors chose was medically unacceptable under the circumstances ... and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), cert. denied, 519 U.S. 1029. A claim of mere negligence or harassment related to medical problems is not enough to make out a violation of the Eighth Amendment. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Simple malpractice, or even gross negligence, does not constitute deliberate indifference. *McGuckin*, 974 F.2d at 1059. Similarly, a difference of opinion between a prisoner-patient and prison medical authorities regarding what treatment is proper and necessary does not give rise to a §1983 claim. *Franklin*, 662 F.2d at 1344; *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). If a plaintiff is claiming a delay of medical care, then he must demonstrate that the delay was actually harmful. *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (per curiam); *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

According to Dr. Leslie Sziebert, Dr. Bell was SCC's Medical Director from March 2007 through July 2009. Dkt. 176, ¶ 9. His duties included patient care and managing SCC's medical program. *Id.* Dr. Sziebert, who is the staff psychiatrist at the SCC, has treated Mr. Ayers. *Id.*, ¶¶ 1, 3. Dr. Sziebert has reviewed Mr. Ayers' medical chart, which are kept in the ordinary course of business at SCC. *Id.*, ¶ 10.

**1.    Broken Thumb**

On June 3, 2008, Mr. Ayers broke his thumb when he punched a telephone on his living unit. Dkt. 16-2, p. 23. Mr. Ayers alleges that Dr. Bell refused to provide him with timely treatments for his broken thumb. Dkt. 178-3, pp. 3-4.

REPORT AND RECOMMENDATION - 18

Mr. Ayers testified, however, that he was first seen by nursing staff on the day of his injury. *Id.* According to Mr. Ayers' medical chart, he broke his thumb on June 3, 2008 at 3:20 p.m. Dkt. 176, ¶ 10, Attachs. B-1, 2. Within three hours of sustaining the injury and complaining of pain, Mr. Ayers was assessed by nursing staff, given pain medication, and had his thumb splinted. Dkt. 176, ¶ 10. On June 5, 2008, Mr. Ayers received an x-ray of his thumb indicating a break. *Id.*, Attach. B-3. On June 6, 2008, Mr. Ayers was transported to a hospital in the community for surgery on his thumb, and returned to SCC on June 7, 2008. *Id.*, Attach. B-4. The surgery included putting temporary pins in his thumb to assist in healing. SCC nursing staff provided post-operative care and changed his dressings. *Id.*, Attach. B-5. On July 31, 2008, Dr. Bell removed the temporary pins and ordered that Mr. Ayers receive physical therapy. *Id.*, Attach. B-6. Mr. Ayers participated off and on in physical therapy sessions and those records indicate that the physical therapy relieved his symptoms. *Id.*, Attach. B-7 through B-24.

Mr. Ayers has presented no evidence to indicate that the treatment he received for his broken thumb was below the standard of medical care or that Dr. Bell acted in conscious disregard of an excessive risk to Mr. Ayers' health. Therefore, this claim should be dismissed with prejudice.

### 2.      Hepatitis C

Mr. Ayers alleges that SCC medical providers Griffith, Bell and Sziebert have refused to facilitate off-Island treatment and to provide him with vitamins to treat his Hepatitis C. Dkt. 16-2, p. 1. Mr. Ayers alleges that Defendant Randal Griffith was "complicit" in the denial of Hepatitis C treatment. Dkt. 16, p. 3. However, his claims against Defendant Griffith were previously dismissed with prejudice. Dkt. 143. The court's prior Report and Recommendation sets forth the background of this claim:

REPORT AND RECOMMENDATION - 19

Mr. Ayers requested to be placed on Interferon treatment for Hepatitis C and this request was presented to SCC's Utilization Review Committee (URC) on January 31, 2006.  Dkt. 103, Exh. B.  The URC Report noted the following "case synopsis/differential or working diagnosis" as to Mr. Ayers:

> Pt has hx of Hep C.  Without liver damage.  Pt is requesting treatment and filed resident grievance.  Pt was committed in June 06.  He has only had one infraction since commitment in Jan 06 for hitting staff in the face when he became angry.  He has history of poor anger management with medical.

Dkt. 103, Exh. B.

The intervention proposed by the URC was as follows:

> Watchful waiting of Hep C with liver function tests. Not to do Hep C tx at this time.

*Id*.

Although Defendant Griffith was on the URC when Mr. Ayers' case was presented, he was not the presenting member.  *Id*., p. 3.  He states that the URC's decision to deny the Hepatitis C treatment was made after a full review of the relevant facts and a decision was made in the best interests of Mr. Ayers.  *Id*. Defendant Griffith also notes in his Affidavit that Mr. Ayers' liver function was normal.  *Id*., p. 2.  Finally, the Court notes that there is no medical evidence before the Court that Plaintiff's medical care requires Interferon treatment.

Defendant Griffith further states that recently Thomas Bell, D.O. has agreed to re-evaluate Mr. Ayers for potential Hepatitis C therapies, despite normal liver function.  *Id*.  However, Mr. Ayers would have to complete certain pre-requisites before he would be a candidate for such treatment, including successfully undergoing a liver biopsy and submitting to a cardiology exam.  *Id*. Mr. Ayers' medical records reflect that a Hep C cardiology and liver biopsy were scheduled on July 15, 2007 and that Mr. Ayers refused transport to go on a medical trip to have the liver biopsy performed on that date.  Dkt. 103, Exh. C. Defendant Griffith states that Mr. Ayers has, within the last few weeks, agreed to the liver biopsy after repeated cancellations and postponements.  *Id*., p. 3.

Dkt. 126, pp. 2-3.

In 2008, Dr. Bell agreed to Mr. Ayers' renewed request to be assessed as a candidate for

Interferon treatment for Hepatitis C.  Dkt. 175, p. 16, ¶ 12.  However, Mr. Ayers failed to

REPORT AND RECOMMENDATION - 20

cooperate in attending medical appointments off-Island required to assess his condition resulting in a delay in reaching a decision whether he was an appropriate candidate at that time.  For example, he failed to attend one screening because he stated he had "been deeply involved in a piece of legal work . . . to meet a federally imposed . . . deadline of 2/28/08," and therefore, he "had been forced into missing [his] 2/28/08 cardio appointment off Island."  *Id.*, Attach. B-33.

After Mr. Ayers attended make-up off-Island medical visits, he began a lengthy trial of Interferon therapy in early 2009.  *Id.*  Mr. Ayers admits that he began a trial of Interferon therapy in early 2009.  Dkt. 178, Attach. B; Dkt. 178-3, p. 9.

Based on his review of Mr. Ayers' medical records, Dr. Sziebert states that Mr. Ayers' condition did not respond beneficially to this treatment and therapy was stopped.  Despite having this condition, laboratory results show normal parameters for liver function.  Dkt. 176, ¶ 12.

There is no medical evidence before the court that Mr. Ayers requires Interferon treatment or vitamins to treat his Hepatitis C.  The undisputed evidence before the court reflects that Mr. Ayers was evaluated for and received a course of Interferon therapy that was not successful.  The undisputed evidence before the court also reflects that Mr. Ayers' liver function is within normal parameters.

Although Mr. Ayers clearly disagrees with the appropriate course of action relating to the care of his Hepatitis C, a difference of opinion with medical authorities regarding what treatment is proper and necessary does not give rise to a § 1983 claim.  *Franklin,* 662 F.2d at 1344; *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).  Mr. Ayers has failed to show how Drs. Bell and Sziebert were deliberately indifferent to his medical condition.  Therefore, the undersigned recommends that Mr. Ayers' claims relating to the treatment of his Hepatitis C be dismissed with prejudice.

REPORT AND RECOMMENDATION - 21

### 3. Medical Care Following Assaults and For "Pain Management"

Mr. Ayers alleges that Dr. Bell refused to provide medical care for injuries Mr. Ayers sustained "during 1/17/06, 4/7/05, 9/11/07 and 5/9/08 and 6/1/08, recent resident, and staff attacks against Plaintiff." Dkt. 16, p. 2.

Mr. Ayers testified that after he was assaulted by other SCC residents on September 11, 2007, Dr. Bell failed to have his ribs x-rayed. Dkt. 178-3, p. 70. According to Dr. Sziebert, conducting x-rays is not necessarily the standard of care for rib injuries because the treatment is no different for a break or a bruise. Dkt. 178, ¶ 13. It is also no longer the standard of care to wrap a rib injury because doing so can lead to complications including pneumonia. *Id.* Mr. Ayers has provided no evidence to the contrary.

There is also nothing in the record before the court indicating that Mr. Ayers suffered injuries or required medical care for any other "attack," or that Dr. Bell failed to provide appropriate pain management medications.

There is evidence that at least on one occasion, Mr. Ayers disagreed with Dr. Bell's assessment regarding the administration of Tylenol and Vicodin. When Mr. Ayers requested Vicodin during the day for pain management and Tylenol during the evening, Dr. Bell explained that this was exactly the opposite of standard medical practice, which would be to take Tylenol during the day when a patient needs to be alert, with Vicodin at night if needed. Dkt. 178, Attach. B-34. Mr. Ayers responded with profanities to this advice. *Id.*

In addition, as noted above, Mr. Ayers' medical records reflect that he has participated off and on in physical therapy sessions and that these sessions have relieved his symptoms. Dkt. 178, ¶ 10.

REPORT AND RECOMMENDATION - 22

Mr. Ayers has not demonstrated that the care he received disregarded a serious medical need. Accordingly, the undersigned recommends that his claim for failure to provide appropriate pain management should be dismissed with prejudice.

**4        Failure to Respond to Grievances**

In his deposition, Mr. Ayers asserted that Dr. Bell violated his rights by failing to respond to Mr. Ayers' grievances made through SCC's internal grievance system. Dkt. 178-3, p. 8. However, according to Ms. Denny, grievances are investigated and responded to by the Grievance Coordinator. The person who is grieved does not respond. Dkt. 177, ¶ 10.

The evidence reflects that Dr. Bell was not responsible for responding to Mr. Ayers' grievances. Therefore, the undersigned recommends that this claim be dismissed with prejudice.

**G.        Excessive Noise, Risk from Assault, and Denial of Medical Meals**

Mr. Ayers asserts that Mr. Weinberg and Dr. Sziebert (1) used "excessive noise" as a form of punishment (Dkt. 16-2, p. 31); (2) were deliberately indifferent to the risk of assaults by other SCC residents (Dkt. 16, p. 2); and (3) that Dr. Sziebert was deliberately indifferent to a serious medical need by failing to renew approval for Mr. Ayers to receive "medical" meals on his living unit (Dkt. 16, p. 38) (Claim # 2 and 10). These claims are analyzed together as they implicate bedroom assignments and treatment plans at SCC.

Due process guarantees civilly detained sexually violent predators access to mental health treatment that provides them an opportunity to be cured or to improve the mental conditions for which they are confined. *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000). Whether this right has been violated is determined by balancing the patient's liberty interests against the relevant state interests. *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). In order to achieve this balance, courts must look to see if

REPORT AND RECOMMENDATION - 23

"professional judgment" was exercised; if so, the state's actions are presumptively valid. *Id.* at 321, 323.  Liability will only be imposed if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

The professional judgment standard is not concerned with what would make patients happier or more productive.  *Society For Good Will To Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1090 (2d Cir. 1990).  Instead, professional judgment is concerned with whether a decision has "substantially met professionally accepted minimum standards." *Id.*  For example, even if the evidence shows an alternative treatment decision might be better, courts may not impose liability so long as professional judgment was exercised.  *Id.*

One of the treatment decisions governed by this professional judgment standard is ward placement within a treatment facility. *See Houghton v. South*, 965 F.2d 1532 (9th Cir. 1992) (using professional judgment standard in evaluating patient's request to be moved from facility's maximum security unit to a less restrictive unit).

### 1.    Excessive Noise

Mr. Ayers alleges that Defendants Mr. Weinberg and Dr. Sziebert used "excessive noise" as a form of punishment.  Dkt. 16-2, p. 31.  In his deposition, Mr. Ayers stated that he was moved from a room at the back of his living unit, where it was quieter, to a room at the front of the unit, where it was louder.  Dkt. 178-4, pp. 17-18.  He states that Dr. Sziebert permitted unnamed staff members to write treatment plan addenda that were "punishing," and signed off on "punishing" treatment plan addenda.  *Id.*, pp. 12-14.

REPORT AND RECOMMENDATION - 24

In his declaration, Dr. Sziebert states that Mr. Ayers' housing assignments have been made in the exercise of professional judgment.  Dkt. 176, ¶ 8.  On one occasion, Dr. Sziebert and Mr. Weinberg decided to move Mr. Ayers from the back of his living unit, which was farthest from the unit staff desk, to a bedroom closer to the staff desk at the front of the unit to improve staff's ability to observe Mr. Ayers' behavior and intervene more quickly when needed.  *Id.*.  The decision to do so was based on Mr. Ayers' longstanding behavioral dyscontrol, intended to protect Mr. Ayers and the other residents who shared a living unit with Mr. Ayers.  *Id.*  Dr. Sziebert states that the noise levels between one end of the living unit and the other were not considered in their decision to move Mr. Ayers and that the move was not intended to punish Mr. Ayers.  *Id.*

The evidence before the court reflects that the decision to assign Mr. Ayers to a specific bedroom was made in the exercise of professional judgment.  There is no evidence that the exercise of this professional judgment did not meet professionally accepted minimum standards.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Ayers' claims relating generally to his bedroom assignment and more specifically, to excessive noise, be granted and the claims dismissed with prejudice.

### 2.    Assault by Other Residents

Mr. Ayers asserts that Walter Weinberg ignored a forseeable danger "and orchestrated conditions for Plaintiff to be attacked, and seriously injured during a 9/11/07 assault by three viscious [sic] detainees."  Dkt. #16 at 2, ¶ 8; *see also* Claim # 11).  He accuses Dr. Sziebert of placing him in "dangerous predicaments" where he was attacked and injured.  Dkt. 178-4, pp. 15-16.  He also accuses Dr. Richards of being "administratively inactive" and failing to respond to situations about which Dr. Richards allegedly was aware. Dkt. 178-4, p. 7.

REPORT AND RECOMMENDATION - 25

1    To impose liability on the Defendants for the incidents where Mr. Ayers has been

2    assaulted by other residents, Mr. Ayers must show that the Defendants acted with deliberate

3    indifference with regard to threats to his safety.  *Redman v. County of San Diego*, 942 F.2d 1435,

4    1443 (9th Cir. 1991).  Under the Eighth Amendment, the test is whether the Defendants, acting

5    with deliberate indifference, exposed Mr. Ayers to a sufficiently substantial "risk of serious

6    damage to his future health."  *Farmer*, 511 U.S. at 843 (quoting *Helling*, 509 U.S. at 35).  To

7    show deliberate indifference, Mr. Ayers must show the Defendants' knowledge of a serious harm

8    and that the Defendants acted or failed to act despite that knowledge.  *See Farmer*, 511 U.S. at

9    842.  Even with knowledge of the risk, and with an injury occurring as a result of the risk,

10   liability may not be imposed if the Defendants show that they acted reasonably in the face of the

11   risk.  *Id*. at 844.

12       The record reflects that Mr. Ayers was attacked by other residents on September 11,

13   2007, May 9, 2008, September 25, 2008.  Dkts. 72 and 176.  Defendants provided the following

14   background regarding the attacks.

15       An SCC resident, Billy A., had been convicted of arson and was sent to the Department

16   of Corrections to serve a five year criminal sentence, which he spent in isolation and seclusion

17   due to his special needs.  Dkt. 176, ¶ 14.  When Billy A. returned to SCC in September 2007, Dr.

18   Sziebert, Mr. Weinberg and another staff member met and conferred to determine the best

19   placement for Billy A., agreeing on Alder North.  *Id.*  Alder North is designed for persons with

20   high management needs, including those resulting from serious mental illness. *Id.*  It was also

21   determined that having Billy A. on the same unit with Mr. Ayers posed a threat to the safety and

22   security of the facility. Thus, the group decided to move Mr. Ayers from Alder North back to

23   Alder West, where he had resided for more than a year before moving to Alder North.  *Id.*

REPORT AND RECOMMENDATION - 26

Mr. Weinberg held a meeting with the residents on Alder West to explain that Mr. Ayers would be returning to Alder West.  Although some residents expressed disagreement with the move, no one threatened Mr. Ayers.  The most hostile remarks were made by Mr. Ayers himself as he was bringing his belongings over to the unit.  *Id.*  According to Dr. Sziebert, the decision to move Mr. Ayers to Alder West was based on limited options for the placement of two very difficult and dangerous residents.  The decision was finally predicated upon not having Billy A. and Mr. Ayers on the same living unit.  *Id.*

On September 11, 2007, a few days after Mr. Ayers' assignment to Alder West, a personal dispute arose between Mr. Ayers and three other residents and those three residents attacked Mr. Ayers.  Dkt. 52, ¶ 14[7].   Staff interceded within approximately 60 seconds.  Plaintiff was taken to the Intensive Management Unit (IMU), where he was seen by medical staff for his injuries (rib pain, abrasions, contusions).  Thereafter, Mr. Ayers was returned to Alder North.  Dkt. 176, ¶ 14.   While Mr. Ayers was housed on Alder North from September 2007 through mid-December 2008, Mr. Ayers was involved in two altercations with Billy A., (May 9, 2008 and September 25, 2008) despite staff efforts to keep the two apart.  Dkt. 72, ¶¶ 6-7.[8]   Mr. Ayers was not injured in either incident.  *Id*. at ¶¶ 9-10.

In December 2008, Mr. Ayers was moved to Cedar North in an effort to give him an opportunity to succeed on a different living unit, to remove Mr. Ayres from the other Alder North residents, and to give Alder North staff a respite from Mr. Ayres' challenging behaviors.  *Id.* at ¶ 4.

---

[7]Dkt. 52 is the Declaration of Cathi D. Harris, filed on November 20, 2008, in support of  Defendants' opposition to Plaintiff's motion for temporary injunction (Dkt. 48).

[8] Dkt. 72 is the Declaration of Walter Weinberg filed on December 24, 2008 in opposition to Plaintiff's motion for preliminary injunction (Dkt. 48).

REPORT AND RECOMMENDATION - 27

The record reflects that placement of Mr. Ayers in various housing units was the result of the exercise of professional judgment, in which SCC staff considered Mr. Ayers' specific needs and his safety and security, as well as the safety and security of SCC staff and other residents. *See, e.g.,* Dkt. 72, ¶¶ 11-12; Dkt. 176, ¶ 14.   Mr. Ayers has provided no evidence to the contrary and has failed to show that his placement was the result of reckless disregard.  *See, e.g., Farmer,* 511 U.S. at 836.   Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Ayers' claim that Defendants failed to protect him from assaults should be granted and this claim dismissed with prejudice.

### 3.    "Medical Meals"

Mr. Ayers alleges that Dr. Sziebert was deliberately indifferent to a serious medical need by denying or declining to renew approval for plaintiff to receive "medical" meals on his living unit.   Dkt. 16, p. 2, ¶ 6.   Mr. Ayers alleges that although Dr. Sziebert was aware of Mr. Ayers' "previously suffered medical conditions," Dr. Sziebert refused to reauthorize his "special diet." *Id.*, p. 38.

According to Dr. Sziebert, SCC residents normally receive their meals in the SCC dining room at scheduled times each day.   Dkt. 176, ¶ 11.   When a resident has a medical or behavioral problem that prevents the resident from traveling to the dining room, with staff approval, the resident may receive his meal on his living unit.   *Id.*   Meals on unit are limited to necessity because the SCC has had on-going issues with residents using food products from meals to brew alcohol (called "pruno").   Pruno presents a significant security hazard to staff and residents, particularly when a resident under the influence of pruno acts out.   *Id.*

Although Mr. Ayers has long asserted that he suffers from Crohn's Disease, his medical file contained no objective medical documentation to support that assertion.   *Id.*, ¶ 11.

REPORT AND RECOMMENDATION - 28

Therefore, SCC arranged for Mr. Ayers to undergo a colonoscopy.  The results of the colonoscopy reflect no evidence of Crohn's Disease.  *Id.*, Attach. B-24.

Dr. Sziebert also states that throughout Mr. Ayers' residence at SCC, Mr. Ayers has engaged in anti-social behavior in an effort to demand meals on unit.  Therefore, Dr. Sziebert decided to control Mr. Ayers' behavior by permitting him to receive meals on unit.  However, Mr. Ayers is required to obtain re-authorization for receiving his meals on unit every three months through either a face-to-face meeting with Dr. Sziebert or a written request.  *Id.*, Attach. B-26.  Dr. Sziebert states that when Mr. Ayers has complied with the procedure to request meals on unit, that request has been approved.  *Id.*

There is no evidence before the court that Mr. Ayers suffers from a serious medical need requiring a special medical diet.  There is also no evidence before the court that Dr. Sziebert deliberately disregarded a serious medical need for a special medical diet.  Rather, the evidence reflects that Mr. Ayers' request for meals on unit are approved when Mr. Ayers complies with the stated procedure.  Accordingly, the undersigned recommends that this claim be dismissed with prejudice.

## H.     Dismissal of State Law Claims

### 1.     Public Disclosure Act

Mr. Ayers alleges that Defendant Becky Denny, in her individual capacity, has denied him the right to receive "public disclosure" documents, in violation of the Washington State Public Disclosure Act (Wash. Rev. Code 45.56) ("Public Disclosure Act")[9].  Dkt. 16, pp. 3, 13; *see also* Claim # 8 described at Dkt. 16, p. 4).

---

[9] Plaintiff alleges that Kristal Wiitalla Knutson was "complicit" in denying him access to public disclosure documents.  Dkt. 16, p. 3.  Although named as a defendant, Ms. Wiitalla Knutson has not been served and therefore,

Washington's Public Disclosure Act permits persons who have been denied an

opportunity to view or copy a public record to bring an action in state court against an "agency"

to show cause why it failed to comply with a proper public records request. Wash. Rev. Code

42.56.550(1).

If Mr. Ayers is claiming that he has made a public disclosure request and that an agency

has failed to provide him with an opportunity to view or copy a public record, he must bring

action to pursue that claim against the agency withholding the information in state court pursuant

to Wash. Rev. Code 42.56.550(1).  In such a situation, the state agency is the proper defendant

under the Act, not individual state actors.

The undersigned recommends that Defendants' motion for summary judgment on this

issue be granted and that all claims for withholding public disclosure documents should be

dismissed with prejudice.

### 2.        Washington's Abuse of a Vulnerable Adult Act, RCW 74.34

Mr. Ayers asserts that Washington's Abuse of Vulnerable Adults Act, Wash. Rev. Code

chapter 74.34 (the "Vulnerable Adults Act") applies to his claims.  Dkt. 16, p. 1.  Defendants

argue that Mr. Ayers does not have standing to raise a claim under the Act.  Dkt. 175, pp. 26-27.

The purpose of the Vulnerable Adults Act is to protect certain persons whose physical or

mental disabilities have placed them in a dependent position. Wash. Rev. Code 74.34.005;

*Calhoun v. State*, 146 Wash. App. 877, 889, 193 P.3d 188 (2008).  The Vulnerable Adults Act

defines a "vulnerable adult" as an adult who either:  (a) is at least sixty years old; (b) is found

incapacitated under chapter 11.88 Wash. Rev. Code; (c) has a developmental disability as

---

personal jurisdiction over her does not currently exist and the Court has no authority over her at this time.  *See* Dkt. 33.

REPORT AND RECOMMENDATION - 30

1    defined under Wash. Rev. Code 71A.10.020; (d) is admitted to any "facility," as that term is

2    defined in the Vulnerable Adults Act; or (e) is receiving services from home health, hospice, or

3    home care agencies licensed or required to be licensed under chapter 70.127 Wash. Rev. Code.

4        Defendants are correct that the Vulnerable Adult Act has no applicability to Mr. Ayers'

5    claims.  Plaintiff is not a vulnerable adult entitled to a cause of action under the Act because he is

6    not at least 60 years old (Dkt. 178-3, p. 2), and because there is no evidence that:  (1) a court has

7    found Mr. Ayers incapacitated as to person or estate, or has appointed a guardian on his behalf

8    (*See* Wash. Rev. Code 11.88.010(1); (2) Mr. Ayers is diagnosed with a developmental disability

9    (*See* Wash. Rev. Code 74.34.005(c); Mr. Ayers is admitted to a "facility" as defined under the

10   Act.  *Calhoun v. State*, 146 Wash. App. 877, 888-89, 193 P.3d 188 (2008) (the Special

11   Commitment Center is not a "facility" as defined under the Act); (5) Mr. Ayers is receiving care

12   in his home and is not receiving hospice care; and (6) Mr. Ayers is receiving services from an

13   individual provider (Wash. Rev. Code 74.34.020(8) (defining an individual provider to mean a

14   person who provides services in the home).

15       Accordingly, Defendants' motion for summary judgment of Mr. Ayers' claims based on

16   an assertion that he is a vulnerable adult as defined in RCW 74.34 should be granted and these

17   claims dismissed with prejudice.

18   I.    **Eleventh Amendment Bars Monetary Claims Against Defendants In Their Official
           Capacity**

19       Mr. Ayers alleges that he is suing the Defendants in their individual capacities.  Dkt. 16,

20   p. 2.  However, Defendants state that Mr. Ayers has made vague, conclusory allegations against

21   Defendants Richard, Sziebert, Bell and Stoddard based on their roles in administrative or

22   management positions by asserting that in their "administrative" capacities, they are responsible

REPORT AND RECOMMENDATION - 31

for the conduct of others.  Dkt. 175, p. 4 (citing Dkt. 178-3, pp. 10-11 (as to Dr. Bell); Dkt. 178-4, pp. 7-8 (as to Dr. Richards); Dkt. 178-4, p. 12 (as to Dr. Sziebert) and Dkt. 178-4, pp. 19-20 (as to Willie Stoddard).

To the extent that any of Plaintiff's allegations can be understood as claims against defendants in their official capacity, the court agrees that those claims must be dismissed.

Absent a waiver of sovereign immunity, neither states nor state officials in their official capacities are subject to suit in federal court under 42 U.S.C. § 1983.  *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).   A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  *Brandon v. Holt,* 469 U.S. 464, 471, 105 S. Ct. 873, 877, 83 L. Ed. 2d 878 (1985).  As such, it is no different from a suit against the State itself.  *See Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3104-05, 87 L. Ed. 2d 114 (1985); *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 2035, n.55, 56 L. Ed. 2d 611 (1978).   The limited exception to this rule is found in *Ex Parte Edward T. Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) (in suit seeking prospective remedy for continuing violation of federal law, court may enjoin state officials).

Therefore, the Eleventh Amendment bars any claims by Mr. Ayers for monetary damages against Defendants in their official capacity and the undersigned recommends that those claims be dismissed with prejudice.

**J.      Qualified Immunity**

Defendants contend that they are entitled to qualified immunity as to Plaintiff's constitutional claims.  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272

REPORT AND RECOMMENDATION - 32

(2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

The court evaluates a defendant's qualified immunity defense using a two-step inquiry. *Id.*

However, the Supreme Court recently held that this two-step inquiry is no longer an inflexible

requirement. *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)

(explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no

longer be regarded as mandatory"). It is within our "sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Id.*

Under *Saucier's* first prong, the court must determine whether, viewing the facts in the

light most favorable to the plaintiff, the government employees violated the plaintiff's

constitutional rights. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If the court determines that a

constitutional violation has occurred, under *Saucier's* second prong, it must determine whether

the rights were clearly established at the time of the violation. *Id.* For a right to be clearly

established, its contours "must be sufficiently clear that a reasonable official would understand

that what he is doing violates the right." *Id.* at 202, 121 S.Ct. 2151 (quoting *Anderson v.

Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The protection afforded

by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly

violate the law.'" *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977

(9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271

(1986)).

The court has concluded that Defendants did not violate Mr. Ayers's constitutional rights.

Therefore, it is not necessary to address Defendants' qualified immunity arguments.

REPORT AND RECOMMENDATION - 33

1

**CONCLUSION**

2   The undersigned recommends that Defendants' motion for summary judgment (Dkt. 175)

3   be **GRANTED** and that the Plaintiff's claims against the Defendants as discussed herein be

4   **Dismissed with Prejudice; except as to any challenge to Mr. Ayers' involuntary civil**

5   **commitment,** which should be **Dismissed Without Prejudice.**

6   Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

7   Procedure, the parties shall have fourteen (14) days from service of this Report to file written

8   objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those

9   objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the

10  time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

11  **August 20, 2010**, as noted in the caption.

12

13

14  DATED this ̲3rd̲ day of August, 2010.

15

16

17  Karen L. Strombom
    United States Magistrate Judge

18

19

20

21

22

23

24

25

26

REPORT AND RECOMMENDATION - 34